**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

Cliffs Mining Company,

               Plaintiff,

v.

Wisconsin Electric Power Co. and
Wisconsin Gas LLC,

               Defendants.

Case No. 2:18-cv-00581-WED
Magistrate Judge William E. Duffin

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS
FOR LACK OF ARTICLE III STANDING AND FAILURE TO STATE A CLAIM**

# EXHIBIT 3

# UNITED STATES
## ENVIRONMENTAL PROTECTION AGENCY
### REGION 5

| | |
|---|---|
| IN THE MATTER OF: | U.S. EPA Docket No. V-W-17-C-010 |
| | CERCLA Docket No. _____ |
| Milwaukee Solvay Coke & Gas Site | |
| 311 East Greenfield Avenue | |
| Milwaukee, Wisconsin | |
| | |
| Wisconsin Gas LLC (d/b/a We Energies) | |
| | |
| Respondent | |
| | |
| Proceeding Under Sections 104, 106(a), 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9604, 9606(a), 9607 and 9622 | **ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT FOR SITE FENCING/SECURITY, ENGINEERING EVALUATION/COST ANALYSIS AND NON-TIME CRITICAL REMOVAL ACTION AT THE UPLANDS** |

TABLE OF CONTENTS

I.      JURISDICTION AND GENERAL PROVISIONS ............................................ 1
II.     PARTIES BOUND .......................................................................................... 1
III.    DEFINITIONS ................................................................................................. 2
IV.     FINDINGS OF FACT ...................................................................................... 4
V.      CONCLUSIONS OF LAW AND DETERMINATIONS ................................ 6
VI.     SETTLEMENT AGREEMENT AND ORDER ............................................... 7
VII.    DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-
        SCENE COORDINATOR ............................................................................... 7
VIII.   WORK TO BE PERFORMED ......................................................................... 8
IX.     PROPERTY REQUIREMENTS ..................................................................... 16
X.      ACCESS TO INFORMATION ....................................................................... 18
XI.     RECORD RETENTION ................................................................................. 19
XII.    COMPLIANCE WITH OTHER LAWS ......................................................... 19
XIII.   EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES ......... 20
XIV.    PAYMENT OF RESPONSE COSTS ............................................................. 21
XV.     DISPUTE RESOLUTION .............................................................................. 23
XVI.    FORCE MAJEURE ........................................................................................ 24
XVII.   STIPULATED PENALTIES .......................................................................... 25
XVIII.  COVENANTS BY EPA .................................................................................. 27
XIX.    RESERVATIONS OF RIGHTS BY EPA ...................................................... 27
XX.     COVENANTS BY RESPONDENT ............................................................... 29
XXI.    OTHER CLAIMS ........................................................................................... 30
XXII.   EFFECT OF SETTLEMENT/CONTRIBUTION ......................................... 30
XXIII.  INDEMNIFICATION ..................................................................................... 31
XXIV.   INSURANCE .................................................................................................. 32
XXV.    MODIFICATION ........................................................................................... 32
XXVI.   ADDITIONAL REMOVAL ACTION ........................................................... 33
XXVII.  NOTICE OF COMPLETION OF WORK ...................................................... 33
XXVIII. INTEGRATION/APPENDICES ..................................................................... 33
XXIX.   EFFECTIVE DATE ........................................................................................ 33

Appendix A - Map of the Site
Appendix B - Statement of Work

i

# I. JURISDICTION AND GENERAL PROVISIONS

1.    This Administrative Settlement Agreement and Order on Consent ("Settlement") is entered into voluntarily by the United States Environmental Protection Agency (EPA) and Wisconsin Gas LLC (d/b/a We Energies) ("Respondent"). This Settlement provides for the installation of fencing and maintenance of Site security, performance of an Engineering Evaluation/Cost Analysis, performance of a non-time critical removal action and the payment of certain response costs incurred by the United States at or in connection with the Uplands area of the "Solvay Coke & Gas Site" (the "Site") generally located at 311 East Greenfield Avenue in the City of Milwaukee, Milwaukee County, Wisconsin.

2.    This Settlement is issued under the authority vested in the President of the United States by Sections 104, 106(a), 107, and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9604, 9606(a), 9607 and 9622 ("CERCLA"). This authority was delegated to the Administrator of EPA on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2923 (Jan. 29, 1987), and further delegated to Regional Administrators on May 11, 1994, by EPA Delegation Nos. 14-14-A (Determinations of Imminent and Substantial Endangerment, Nov. 1, 2001),] 14-14-C (Administrative Actions Through Consent Orders, Apr. 15, 1994) and 14-14-D (Cost Recovery Non-Judicial Agreements and Administrative Consent Orders, May 11, 1994). This authority was further redelegated by the Regional Administrator of EPA Region 5 to the Director, Superfund Division, U.S. EPA, Region 5 by U.S. Delegation Nos. 14-14-C and 14-14-D on May 2, 1996.

3.    EPA has notified the State of Wisconsin (the "State") of this action pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

4.    EPA and Respondent recognize that this Settlement has been negotiated in good faith and that the actions undertaken by Respondent in accordance with this Settlement do not constitute an admission of any liability. Respondent does not admit, and retains the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement, the validity of the findings of facts, conclusions of law, and determinations in Sections IV (Findings of Fact) and V (Conclusions of Law and Determinations) of this Settlement. Respondent agrees to comply with and be bound by the terms of this Settlement and further agrees that it will not contest the basis or validity of this Settlement or its terms.

## II. PARTIES BOUND

5.    This Settlement is binding upon EPA and upon Respondent and its successors, and assigns. Any change in ownership or corporate status of Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter Respondent's responsibilities under this Settlement.

6.    The undersigned representative of Respondent certifies that he or she is fully authorized to enter into the terms and conditions of this Settlement and to execute and legally bind Respondent to this Settlement.

7.    Respondent shall provide a copy of this Settlement to each contractor hired to perform the Work required by this Settlement and to each person representing Respondent with

1

respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Settlement. Respondent or its contractors shall provide written notice of the Settlement to all subcontractors hired to perform any portion of the Work required by this Settlement. Respondent shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work in accordance with the terms of this Settlement.

## III. DEFINITIONS

8.      Unless otherwise expressly provided in this Settlement, terms used in this Settlement that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Settlement or its attached appendices, the following definitions shall apply:

"Action Memorandum" shall mean an EPA Action Memorandum defining the scope of the non-time critical removal action at the Site to be issued by the Regional Administrator, EPA Region V, or his/her delegate after completion of the EE/CA.

"Affected Property" shall mean all real property at the Site and any other real property where EPA determines, at any time, that access or land, water, or other resource use restrictions are needed to implement the Work, including, but not limited to, that parcel generally located at 311 East Greenfield Avenue, Milwaukee, Wisconsin.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Day" or "day" shall mean a business day (i.e., excluding any Saturday, Sunday, or federal or State holiday).

"Effective Date" shall mean the effective date of this Settlement as provided in Section XXIX.

"Engineering Evaluation and Cost Analysis" ("EE/CA") shall mean a report on alternative response actions pursuant to 40 C.F.R. § 300.415(b)(4)(i) to address environmental concerns in connection with the Site.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including but not limited to, direct and indirect costs, that the United States and WDNR incur in reviewing or developing deliverables submitted pursuant to this Settlement, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this Settlement, including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Section IX

2

(Property Requirements) (including, but not limited to, cost of attorney time, including, but not limited to, the amount of just compensation), Section XIII (Emergency Response and Notification of Releases), Paragraph 85 (Work Takeover), Paragraph 31 (Community Relations Plan) (including, but not limited to, the costs of any technical assistance grant under Section 117(e) of CERCLA), Section XV (Dispute Resolution), and all litigation costs. Future Response Costs shall also include Agency for Toxic Substances and Disease Registry (ATSDR) costs regarding the Site, and all Interim Response Costs.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www.epa.gov/ocfopage/finstatement/superfund/int_rate.htm.

"Interim Response Costs" shall mean all costs, including but not limited to direct and indirect costs, (a) paid by the United States in connection with the Work between May 8, 2017 and the Effective Date, or (b) incurred by the United States prior to the Effective Date in connection with the Work, but paid after that date.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Owner Respondent" shall mean the Respondent. The clause "Owner Respondent's Affected Property" means Affected Property owned or controlled by Owner Respondent.

"Paragraph" shall mean a portion of this Settlement identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean EPA and Respondent.

"Post-Removal Site Control" shall mean actions necessary to ensure the effectiveness and integrity of the removal action to be performed pursuant to this Settlement consistent with Sections 300.415(7) and 300.5 of the NCP and "Policy on Management of Post-Removal Site Control" (OSWER Directive No. 9360.2-02, Dec. 3, 1990).

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Respondent" shall mean Wisconsin Gas LLC (d/b/a We Energies).

"Section" shall mean a portion of this Settlement identified by a Roman numeral.

"Settlement" shall mean this Administrative Settlement Agreement and Order on Consent and all appendices attached hereto (listed in Section XXVIII (Integration/Appendices)). In the event of conflict between this Settlement and any appendix, this Settlement shall control.

3

"Site" shall mean the Solvay Coke & Gas Superfund Site, encompassing approximately 45 acres, located at 411 East Greenfield Avenue in the City of Milwaukee, Milwaukee County, Wisconsin. For purposes of this Settlement, the Site consists of the Uplands and shall not include the adjacent Kinnickinnic River or any sediment therein.

"Solvay Coke Special Account" shall mean the special account within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"State" shall mean the State of Wisconsin.

"Statement of Work" or "SOW" shall mean the document describing the activities Respondent must perform to prepare the EE/CA and implement the removal action as set forth in Appendix B, and any modifications made thereto in accordance with this Settlement.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Uplands" shall mean the area designated as uplands on Appendix A.

"Waste Material" shall mean (a) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. 9601(14); (b) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (c) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (d) any "hazardous substance" under Chapter 292, Wis. Stats.

"WDNR" shall mean the Wisconsin Department of Natural Resources and any successor departments or agencies of the State.

"Work" shall mean all activities and obligations Respondent is required to perform under this Settlement except Post-Removal Site Control and those activities and obligations required by Section XI (Record Retention).

## IV. FINDINGS OF FACT

9.     The Site covers approximately 45 acres in a primarily industrial and commercial area north of the Kinnickinnic River and west of the Lincoln Memorial Harbor. The Site is bordered to the north by East Greenfield Avenue, to the northeast by railroad tracks and a former coal storage area, to the east and south by the Kinnickinnic River, and to the west by railroad tracks.

10.     The Site is comprised of a number of lots. Various industrial activities have occurred on different lots since at least 1900, and probably as early as 1866. A manufactured coke and gas facility located on the northern portion of the Site was operated by various entities until approximately 1983. Wisconsin Wrecking operated a scrap and salvage operation on the

4

northern portion of the Site until January 2003, when it assigned its interest in the Site to Water Street Holdings, LLC. At the same time Cliffs Mining Company conveyed the Site, via quit claim deed, to Water Street Holdings, LLC. Shortly thereafter Water Street Holdings, LLC, conveyed the Site, via quit claim deed, to Golden Marina Causeway, LLC. Most of the major coke and gas manufacturing buildings on the northern half of the Site were demolished during a surface removal that was conducted during 2003-2005 pursuant to an Administrative Order by Consent dated February 14, 2003 (V-W-03-C-733) ("2003 Removal Order").

11.　　On October 25, 2001, EPA, WDNR, and the City of Milwaukee conducted a site reconnaissance to evaluate site conditions to determine potential areas of contamination for sampling. From December 10-19, 2001, EPA conducted a multimedia sampling event at the Site to screen for possible contamination and identify threats to human health and the environment. Based upon the results of that sampling event EPA's contractor, Tetra Tech EM, Inc., prepared a site assessment report dated May 1, 2002 ("2002 Site Assessment"), that summarized site conditions, threats to the public health or welfare or the environment, and actual or threatened releases of hazardous substances to the environment. Hazardous substances documented at the Site in the 2002 Site Assessment included inorganics (antimony, arsenic, cadmium, chromium, copper, cyanide, lead, iron, mercury), asbestos containing material (ACM), benzene, carbazole, and polynuclear aromatic hydrocarbons (PAH) such as benzo(a)anthracene, benzo(b)fluoranthene, benzo(a)pyrene, benzo(g,h,i)perylene, benzo(k)fluoranthene, chrysene, fluoranthene, indeno(1,2,3-c,d)pyrene, phenanthrene, pyrene, and other organics (dibenzofuran and naphthalene).

12.　　In response to conditions documented in the 2002 Site Assessment, EPA entered into the 2003 Removal Order with Cliffs Mining Company, Water Street Holdings, LLC, and Wisconsin Wrecking, LLC, to address four primary sources of hazardous substances: (1) asbestos containing material present in many of the structures, on piping inside and outside structures, and loose asbestos containing material located on the ground, (2) coal tar from the manufactured gas plant operations located in tanks, piping, on the ground, and in an open pit area; (3) numerous above ground storage tanks and associated piping containing coal tar and other residues, and (4) other hazardous substances located throughout the Site such as drums of naphthalene crystals and oil in old electrical transformers. As required by the 2003 Removal Order, a summary of the types and quantities of waste handled and shipped off-site for disposal was provided to EPA by EarthTech in a final report dated March 2005. The 2003 Removal Order did not require the investigation, sampling or excavation and removal of any subsurface hazardous substances or materials. In addition, EarthTech's final report documented releases that occurred at the Site both before and during the removal action that were not addressed as part of the work under the 2003 Removal Order. On September 6, 2005, U.S. EPA issued Notice of Completion of On-Site Work under Order No. V-W-03-C-733. The Notice of Completion summarized the removal actions taken at the Site, approved the post-removal site control plan proposed by the parties, and except for certain on-going obligations, closed the Removal Order. The 2003 Removal Order required the maintenance of Site security.

13.　　EPA, the Respondent and certain other parties entered into an Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study as of January 31, 2007 (V-W-07-C-861) ("RI/FS AOC"). Work performed under the RI/FS AOC

5

resulted in a final Remedial Investigation Report, which was approved by EPA on September 14, 2016 ("RI Report").

14.     Surface and subsurface contamination not addressed under the 2003 Removal Order remains at the Site and is a source of potential exposure to humans and wildlife. Field observations during the remedial investigation were used to evaluate the presence of process residuals (e.g., coal, coke and other fill materials) and potentially mobile non-aqueous phase liquids ("NAPL") at the Site. Analytical laboratory data for surface and subsurface samples were used to establish chemical constituents present at the Site and their extent relative to regulatory screening values. Constituents that exceeded their respective EPA industrial regional screening level in surface or subsurface samples include polycyclic aromatic hydrocarbons (PAHs), arsenic, lead, mercury and cyanide. PAHs were evaluated as total PAHs, naphthalene, and benzo(a)pyrene toxic equivalents. Benzo(a)pyrene exceedances included the regional removal management level within 0-2 feet of the surface. Constituents in groundwater at the Site exceeding threshold standards include benzene, naphthalene, arsenic and ammonia. Contaminants in surface and subsurface locations create the potential for human and wildlife exposure and off-site migration.

15.     On September 17, 2015, the City of Milwaukee filed a petition with the Circuit Court for Milwaukee County, Wisconsin, asking for an order compelling a prior owner of the Site to raze seven buildings the City of Milwaukee deemed unfit for human habitation, occupancy, or use (Case No. 15 CV 007603 (the "Raze Action")). After the commencement of the Raze Action, the prior owner completed the demolition of three buildings. The remaining buildings were demolished by Respondent as sought by the City of Milwaukee in the Raze Action.

16.     Respondent secured the Site by erecting a fence on three sides, but humans and wild animals can potentially gain access to the Site from the unsecured side that borders the Kinnickinnic River and can be exposed to hazardous substances or foundations of buildings that have been demolished. Although a large amount of material was removed under the 2003 Removal Order, as documented in the RI Report, hazardous substances remain at the Site.

17.     The Site has not been proposed for inclusion on the National Priorities List ("NPL") pursuant to CERCLA Section 105, 42 U.S.C. § 9605, however, previous scoring activities indicate the Site would qualify for inclusion on the NPL.

V. CONCLUSIONS OF LAW AND DETERMINATIONS

18.     Based on the Findings of Fact set forth above, and the administrative record, EPA has determined that:

a.     The Solvay Coke & Gas Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b.     The contamination found at the Site, as identified in the Findings of Fact above, includes "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

6

      c.      The Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(2l).

      d.      Respondent is the current "owner" and/or "operator" of the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), and is therefore a responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

      e.      Conditions described in the Findings of Fact above constitute an actual or threatened "release" of a hazardous substance from the facility as defined by Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

      f.      Conditions described in the Findings of Fact above may constitute an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the facility within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

      g.      The Work required by this Settlement is necessary to protect the public health, welfare, or the environment and, if carried out in compliance with the terms of this Settlement, will be consistent with the NCP, as provided in Section 300.700(c)(3)(ii) of the NCP.

## VI. SETTLEMENT AGREEMENT AND ORDER

    19.      Based upon the Findings of Fact, Conclusions of Law, and Determinations set forth above, and the administrative record, it is hereby Ordered and Agreed that Respondent shall comply with all provisions of this Settlement, including, but not limited to, all appendices to this Settlement and all documents incorporated by reference into this Settlement.

## VII. DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR

    20.      Respondent shall retain one or more contractors or subcontractors to perform the Work and shall notify EPA of the name(s) and qualifications of such contractor(s) or subcontractor(s) within five (5) days after the Effective Date. Respondent shall also notify EPA of the name(s) and qualification(s) of any other contractor(s) or subcontractor(s) retained to perform the Work at least fifteen (15) days prior to commencement of such Work. EPA retains the right to disapprove of any or all of the contractors and/or subcontractors retained by Respondent. If EPA disapproves of a selected contractor or subcontractor, Respondent shall retain a different contractor or subcontractor and shall notify EPA of that contractor's or subcontractor's name and qualifications within forty-five (45) days after EPA's disapproval.

    21.      Respondent has designated, and EPA has not disapproved, the following individual as Project Coordinator, who shall be responsible for administration of all actions by Respondent required by this Settlement:

      Robert Paulson
      Principal Environmental Consultant
      WEC Business Services

7

333 W. Everett Street - A231
Milwaukee, WI 53203
(414) 221-3948
robert.paulson@we-energies.com

22.     EPA has designated the following as its On-Scene Coordinator ("OSC") and Remedial Project Manager ("RPM"):

Viral Patel
On-Scene Coordinator/Remedial Project Manager
Superfund – Remedial Response Section Five
U.S. EPA Region 5 – SR-6J
77 W. Jackson Blvd.
Chicago, IL   60604
(312) 886-6943
patel.viral@epa.gov

23.     EPA and Respondent shall have the right to change their respective designated OSC or Project Coordinator. Respondent shall notify EPA fifteen (15) days before such a change is made, and EPA reserves the right to disapprove the new Project Coordinator. The initial notification by Respondent may be made orally, but shall be promptly followed by a written notice.

24.     The OSC shall be responsible for overseeing Respondent's implementation of this Settlement. The OSC shall have the authority vested in an OSC by the NCP, including the authority to halt, conduct, or direct any Work required by this Settlement, or to direct any other removal action undertaken at the Site. Absence of the OSC from the Site shall not be cause for stoppage of work unless specifically directed by the OSC.

## VIII. WORK TO BE PERFORMED

25.     Respondent shall perform an EE/CA and, following EPA's approval of the EE/CA, EPA will select removal actions for the Site in an Action Memorandum. Respondent shall perform, at a minimum, all actions necessary to implement the Action Memorandum, including, but not limited to, the Work described below.

26.     The actions to be implemented by Respondent generally include, but are not limited to, the following undertaken in accordance with this Order and the attached SOW, which is incorporated into this Order by reference as if set forth in whole herein:

a.     Health and Safety Plan

b.     EE/CA Support Sampling Plan

c.     EE/CA

d.     Monthly Reports

8

e.    EE/CA Report

f.    Removal Action Work Plan

g.    Removal Action Implementation

h.    Removal Action Report

27.    Subject to issuance of the Action Memorandum and compliance with the requirements set forth therein, the Removal Action is anticipated to cover the following:

a.    Address unacceptable risk pathways

1)    Complete remedial design for the Uplands, including appropriate soil and Waste Material handling plans and assessment of shoreline stability

2)    Remediate source areas as necessary and as appropriate (excavate, ISS, ISCO) to address direct contact, surface and groundwater migration pathways, and soil vapor pathway.

3)    Install where appropriate a surface barrier on Uplands to prevent risks associated with groundwater, surface water migration, and direct contact

4)    Identify and establish necessary institutional controls (zoning, non-residential), engineering controls (VI, GW) and continuing obligations (WDNR database, soil management plan) consistent with land use/zoning and state law (292.12 and NR 700 rule series)

5)    Undertake Work to prevent new Uplands discharges from exceeding site-specific, risk-based criteria for sediment and water quality criteria for surface waters through:

i.    Engineering controls or other shoreline barriers

ii.    Identification and removal of utilities, pipes, and other migration pathways to surface water.

6)    Undertake all Work consistent with the NCP, 40 CFR Part 300, and NR 700-745.

28.    Secure, Maintain and Prepare the Site.  Work set forth in Paragraph 26 shall be performed in a timely manner, whether before or after the effective date of this Settlement, consistent with good commercial practice and applicable laws and regulations.

29.    Health and Safety Plan. Within twenty (20) days after the Effective Date, Respondent shall submit for EPA review and comment a plan that ensures the protection of the

9

public health and safety during performance of on-site work under this Settlement. This plan shall be prepared in accordance with "OSWER Integrated Health and Safety Program Operating Practices for OSWER Field Activities," Pub. 9285.0-OIC (Nov. 2002), available on the NSCEP database at http://vvww.epa.gov/nscep/index.html, and "EPA's Emergency Responder Health and Safety Manual," OSWER Directive 9285.3-12 (July 2005 and updates), available at http://www.epaosc.org/ HealthSafetyManual/manual-index.htm. In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration (OSHA) regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning. Respondent shall incorporate all changes to the plan recommended by EPA and shall implement the plan during the pendency of the removal action.

   30.   EE/CA Support Sampling Plan and QAPP.

        a.     Respondent shall use quality assurance, quality control, and other technical activities and chain of custody procedures for all samples consistent with "EPA Requirements for Quality Assurance Project Plans (QA/R5)" EPA/240/B-01/003 (March 2001, reissued May 2006), "Guidance for Quality Assurance Project Plans (QA/G-5)" EPA/240/R-02/009 (December 2002), and "Uniform Federal Policy for Quality Assurance Project Plans," Parts 1-3, EPA/505/B-04/900A-900C (March 2005).

        b.     Within twenty (20) days after the Effective Date, Respondent shall submit an EE/CA Support Sampling Plan and QAPP to EPA for review and approval. This plan shall consist of a Field Sampling Plan (FSP) and a Quality Assurance Project Plan (QAPP) that is consistent with the EE/CA and Removal Work Plan, the NCP and , including, but not limited to, "Guidance for Quality Assurance Project Plans (QA/G-5)" EPA/240/R-02/009 (December 2002), "EPA Requirements for Quality Assurance Project Plans (QA/R-5)" EPA 240/B-01/003 (March 2001, reissued May 2006), and "Uniform Federal Policy for Quality Assurance Project Plans," Parts 1-3, EPA/505/B-04/900A- 900C (March 2005). Upon its approval by EPA, the Sampling and Analysis Plan shall be incorporated into and become enforceable under this Settlement.

        c.     Respondent shall ensure that EPA and State personnel and their authorized representatives are allowed access at reasonable times to all laboratories utilized by Respondent in implementing this Settlement. In addition, Respondent shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance, quality control, and technical activities that will satisfy the stated performance criteria as specified in the QAPP and that sampling and field activities are conducted in accordance with EPA's "Field Operations Group Operational Guidelines for Field Activities" (http://vvww.epa.gov/region8/qa/FieldOperationsGroupOperationalGuidelinesForFieldActivities. pdf) and "EPA QA Field Activities Procedure" (http://www.epa.gov/irmpoli8/policies/2105-p-02.pdf). Respondent shall ensure that the laboratories they utilize for the analysis of samples taken pursuant to this Settlement meet State certification requirements under NR 149 and the competency requirements set forth in EPA's "Policy to Assure Competency of Laboratories, Field Sampling, and Other Organizations Generating Environmental Measurement Data under Agency-Funded Acquisitions" (http://www.epa.gov/fem/pdfs/fem-lab-competency-policy.pdf) and that the laboratories perform all analyses according to accepted EPA methods. Accepted EPA methods consist of, but are not limited to, methods that are documented in the EPA's Contract Laboratory Program (http://www.epa.gov/superfund/programs/clp/), SW 846 "Test

Methods for Evaluating Solid Waste, Physical/Chemical Methods"
(http://www.epa.gov/epawaste/hazard/testmethods/sw846/online/index.htm), "Standard Methods
for the Examination of Water and Wastewater" (http://www.standardmethods.org/), 40 C.F.R.
Part 136, "Air Toxics - Monitoring Methods" (http://www.epa.gov/ttnamti1/airtox.html)."

      d.     However, upon approval by EPA, after a reasonable opportunity for
review and comment by the State, Respondent may use other appropriate analytical method(s),
as long as (i) quality assurance/quality control (QA/QC) criteria are contained in the method(s)
and the method(s) are included in the QAPP, (ii) the analytical method(s) are at least as stringent
as the methods listed above and State certification requirements at NR 149, and (iii) the
method(s) have been approved for use by a nationally recognized organization responsible for
verification and publication of analytical methods, e.g., EPA, ASTM, NIOSH, OSHA, etc.
Respondent shall ensure that all laboratories they use for analysis of samples taken pursuant to
this Settlement have a documented Quality System that complies with ASQ/ANSI E4:2014
"Quality management systems for environmental information and technology programs -
Requirements with guidance for use" (American Society for Quality, February 2014), and "EPA
Requirements for Quality Management Plans (QA/R-2)" EPA/240/B-01/002 (March 2001,
reissued May 2006), or equivalent documentation as determined by EPA. EPA may consider
Environmental Response Laboratory Network (ERLN) laboratories, laboratories accredited
under the National Environmental Laboratory Accreditation Program (NELAP), or laboratories
that meet International Standardization Organization (ISO 17025) standards or other nationally
recognized programs as meeting the Quality System requirements. Respondent shall ensure that
all field methodologies utilized in collecting samples for subsequent analysis pursuant to this
Settlement are conducted in accordance with the procedures set forth in the QAPP approved by
EPA.

      e.     Upon request, Respondent shall provide split or duplicate samples to EPA
and the State or their authorized representatives. Respondent shall notify EPA and the State not
less than seven (7) days in advance of any sample collection activity unless shorter notice is
agreed to by EPA. In addition, EPA and the State shall have the right to take any additional
samples that EPA or the State deem necessary. Upon request, EPA and the State shall provide to
Respondent split or duplicate samples of any samples they take as part of EPA's oversight of
Respondent's implementation of the Work.

      f.     Respondent shall submit to EPA and WDNR the results of all sampling
and/or tests or other data obtained or generated by or on behalf of Respondent with respect to the
Site and/or the implementation of this Settlement.

      g.     Respondent waives any objections to any data gathered, generated, or
evaluated by EPA, the State or Respondents in the performance or oversight of the Work that has
been verified according to the QA/QC procedures required by the Settlement or any EPA-
approved Work Plans or Sampling and Analysis Plans. If Respondent objects to any other data
relating to the Work, Respondent shall submit to EPA a report that specifically identifies and
explains its objections, describes the acceptable uses of the data, if any, and identifies any
limitations to the use of the data. The report must be submitted to EPA within fifteen (15) days
after the monthly progress report containing the data.

31.     Community Relations Plan. EPA has a community involvement plan (CIP) for the Site. All community involvement activities will be done by EPA in accordance with the CIP. If a community group expresses interest in a Technical Assistance Plan, the Respondent shall work with the group and provide funding as may be required by the NCP. Any community involvement activities conducted by Respondent are subject to EPA's oversight. EPA has already established an information repository and administrative record near the Site. EPA will update this administrative record or have a separate one for the Work under this Settlement.

32.     EE/CA. Respondents shall perform the EE/CA to evaluate alternatives for conducting a non-time critical removal action at the Site. The EE/CA shall be conducted pursuant to the attached scope of work to accomplish the following removal action objectives:

        a.     Prevention or abatement of actual or potential exposure to on-site and nearby human populations, animals, or the food chain from hazardous substances;

        b.     Prevention or abatement of actual or potential contamination of drinking water supplies or sensitive ecosystems;

        c.     Stabilization or elimination of hazardous substances that may pose a threat or release to surface or groundwater, air, soil, and sediment;

        d.     Treatment or elimination of hazardous substances in soil to prevent or abate migration to groundwater and air pathways;

        e.     A human health risk-based clean-up level for an industrial land use classification, as defined in NR 700.03;

        f.     Mitigation or abatement of other situations or factors that may pose threats to public health, welfare, or the environment; and

        g.     Evaluation of alternatives for shoreline stabilization to prevent or abate migration of surface and subsurface contaminants.

33.     Monthly Reports. Respondent shall submit a written progress report to EPA and WDNR concerning actions undertaken pursuant to this Settlement on a monthly basis, or as otherwise requested by EPA, from the Effective Date until issuance of Notice of Completion of Work pursuant to Section XXVII, unless otherwise directed in writing by the OSC. These reports shall describe all significant developments during the preceding period, including the actions performed and any problems encountered, analytical data received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

34.     EE/CA Report. Respondents shall prepare and submit to EPA for approval a draft EE/CA Report pursuant to the attached Statement of Work. EPA may approve, disapprove, and/or request modifications to the EE/CA Report. If EPA disapproves or requests modifications, Respondents shall submit a revised EE/CA Report that fully incorporates EPA's modifications within fifteen (15) days of receipt of EPA's request.

12

35. Removal Action Work Plan.

a. After considering public comments on the EE/CA Report and preparing an Action Memorandum selecting the removal alternative, EPA will provide Respondent with a written notice to proceed. Within thirty (30) days of receiving written notice to proceed from EPA, Respondent shall submit for EPA's approval, a Removal Action Work Plan for implementation of the removal action selected by EPA. The Removal Action Work Plan shall be drafted in accordance with the Action Memorandum. The draft Removal Action Work Plan shall provide a description of, and an expeditious schedule for, the actions required by this Order.

b. EPA may approve, disapprove, require revisions to, or modify the draft Removal Work Plan in whole or in part. If EPA requires revisions, Respondents shall submit a revised draft Removal Work Plan within thirty (30) days after receipt of EPA's notification of the required revisions. Respondent shall implement the Removal Work Plan as approved in writing by EPA in accordance with the schedule approved by EPA. Once approved, or approved with modifications, the Removal Work Plan, the schedule, and any subsequent modifications shall be incorporated into and become fully enforceable under this Settlement.

c. Unless otherwise provided in this Settlement, any additional deliverables that require EPA approval under the Removal Work Plan shall be reviewed and approved by EPA in accordance with this Paragraph.

36. Removal Action Implementation. Within thirty (30) days after receipt of approval of the Removal Action Work Plan, Respondent shall commence implementation of the Work in accordance with the schedule included therein. Respondent shall not commence or perform any Work except in conformance with the terms of this Settlement.

37. Final Report. Within sixty (60) days after completion of all Work required by this Settlement, other than continuing obligations under this Settlement, Respondent shall submit for EPA review a final report summarizing the actions taken to comply with this Settlement.

a. The final report shall conform, at a minimum, with the requirements set forth in Section 300.165 of the NCP entitled "OSC Reports" and the standards for closure under NR 726, Wis. Admin. Code, administered by WDNR. The final report shall include a good faith estimate of total costs or a statement of actual costs incurred in complying with the Settlement, a listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination(s) of those materials, a presentation of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal action (e.g., manifests, invoices, bills, contracts, and permits).

b. The final report shall also include the following certification signed by a responsible corporate official of a Respondent or Respondent's Project Coordinator: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the

13

information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

38. For any regulation or guidance referenced in the Settlement, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after Respondent receives notification from EPA of the modification, amendment, or replacement.

39. Submission of Deliverables.

    a. General Requirements for Deliverables.

Except as otherwise provided in this Settlement, Respondent shall direct all submissions required by this Settlement to the OSC at the address set forth in Paragraph 22.

Respondent shall submit all deliverables required by this Settlement, or any approved work plan to EPA in accordance with the schedule set forth in such plan.

Respondent shall submit all deliverables in electronic form. Technical specifications for sampling and monitoring data and spatial data are addressed in Paragraph 39.b. All other deliverables shall be submitted to EPA in the form specified by the OSC. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5 x 11 inches, Respondents shall also provide EPA with paper copies of such exhibits.

    b. Technical Specifications for Deliverables.

        1) Sampling and monitoring data should be submitted in standard Regional Electronic Data Deliverable (EDD) format. Other delivery methods may be allowed if electronic direct submission presents a significant burden or as technology changes.

        2) Spatial data, including spatially-referenced data and geospatial data, should be submitted: (a) in the ESRI File Geodatabase format; and (b) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its EPA profile, the EPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the EPA Metadata Editor (EME), complies with these FGDC and EPA metadata requirements and is available at https://edg.epa.gov/EME/.

        3) Each file must include an attribute name for each site unit or sub-unit submitted. Consult http://www.epa.gov/geospatial/policies.html for any further available guidance on attribute identification and naming.

14

4)      Spatial data submitted by Respondent does not, and is not intended to, define the boundaries of the Site.

40.     Post-Removal Site Control. In accordance with the Removal Work Plan schedule, or as otherwise directed by EPA, Respondent shall submit a proposal for Post-Removal Site Control which shall include, but not be limited to any necessary engineering controls and any necessary institutional controls, such as deed restrictions, to protect future workers or users of the Site based on intended future use and cleanup standards achieved through the Work under this Settlement. Upon EPA approval, Respondent shall either conduct Post-Removal Site Control activities, or obtain a written commitment from another party for conduct of such activities, until such time as EPA, or WDNR in the case that the Site is deferred to the State following completion of the Work under this Settlement, determines that no further Post-Removal Site Control is necessary. Respondent shall provide EPA and WDNR with documentation of all Post-Removal Site Control commitments.

41.     Off-Site Shipments.

a.      Respondent may ship hazardous substances, pollutants and contaminants from the Site to an off-Site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondent will be deemed to be in compliance with CERCLA Section 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if Respondent obtains a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b). Notwithstanding the provisions of Paragraph 41.a., Respondent may request EPA approval to ship any such material to its power plants if such material can be processed at such facilities.

b.      Respondent may ship Waste Material from the Site to an out-of-state waste management facility only if, prior to any shipment, they provide written notice to the appropriate state environmental official in the receiving facility's state and to the OSC. This written notice requirement shall not apply to any off-Site shipments when the total quantity of all such shipments will not exceed ten cubic yards. The written notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. Respondent also shall notify the state environmental official referenced above and the OSC of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. Respondent shall provide the written notice after the award of the contract for the removal action and before the Waste Material is shipped.

c.      Respondent may ship Investigation Derived Waste (IDW) from the Site to an off-Site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, EPA's "Guide to Management of Investigation Derived Waste," OSWER 9345.3-03FS (Jan. 1992), and any IDW-specific requirements contained in the Action Memorandum. Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 C.F.R. § 261.4(e) shipped off-Site for treatability studies, are not subject to 40 C.F.R. § 300.440.

15

## IX. PROPERTY REQUIREMENTS

42.     <u>Agreements Regarding Access and Non-Interference</u>. Respondent shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by Respondent and the EPA, providing that such Non-Settling Owner shall, with respect to: (i) provide the EPA, the State, Respondent, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the Settlement, including those activities listed in Paragraph 42.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the removal action, including the restrictions listed in Paragraph 42.b (Land, Water, or Other Resource Use Restrictions).

a.     <u>Access Requirements</u>. The following is a list of activities for which access is required regarding the Affected Property:

1)     Monitoring the Work;

2)     Verifying any data or information submitted to the United States or the State;

3)     Conducting investigations regarding contamination at or near the Site;

4)     Obtaining samples;

5)     Assessing the need for, planning, implementing, or monitoring response actions;

6)     Assessing implementation of quality assurance and quality control practices as defined in the approved quality assurance quality control plan [as provided in the SOW] [if QAPP is required by Removal Work Plan insert: as defined in the approved QAPP];

7)     Implementing the Work pursuant to the conditions set forth in Paragraph 85 (Work Takeover);

8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Respondent or their agents, consistent with Section X (Access to Information);

9)     Assessing Respondent's compliance with the Settlement;

10)     Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Settlement; and

16

11) Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions regarding the Affected Property.

b. <u>Land, Water, or Other Resource Use Restrictions</u>. All necessary land, water, or other resource use restrictions applicable to the Affected Property will be identified in the EE/CA, Action Memorandum and incorporated into the Post-Removal Site Control.

43. Owner Respondent shall not Transfer its Affected Property unless it has first secured EPA's approval of, and transferee's consent to, an agreement that: (i) is enforceable by Respondent and EPA; and (ii) requires the transferee to provide access to and refrain from using the Affected Property to the same extent as is provided under Paragraphs 42.a (Access Requirements) and 42.b (Land, Water, or Other Resource Use Restrictions).

44. If EPA determines in a decision document prepared in accordance with the NCP that institutional controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, Respondents shall cooperate with EPA's and the State's efforts to secure and ensure compliance with such institutional controls.

45. In the event of any Transfer of the Affected Property, unless EPA otherwise consents in writing, Respondent shall continue to comply with its obligations under the Settlement, including their obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property.

46. <u>Notice to Successors-in-Title</u>.

a. Respondent shall, within fifteen (15) days after the Effective Date, submit for EPA approval a notice to be filed regarding Respondent's Affected Property in the appropriate land records. The notice must: (1) include a proper legal description of the Affected Property; (2) provide notice to all successors-in-title that: (i) the Affected Property is part of, or related to, the Site; (ii) EPA is expected to select a removal action for the Site; and (iii) potentially responsible parties have entered into an Administrative Settlement Agreement and Order on Consent requiring implementation of that removal action; and (3) identify the name, docket number, and effective date of this Settlement. Respondent shall record the notice within 10 days after EPA's approval of the notice and submit to EPA, within 10 days thereafter, a certified copy of the recorded notice.

b. Respondent shall, prior to entering into a contract to Transfer its Affected Property, or sixty (60) days prior to Transferring its Affected Property, whichever is earlier:

1) Notify the proposed transferee that EPA has selected a removal action regarding the Site, that potentially responsible parties have entered into an Administrative Settlement Agreement and Order on Consent requiring implementation of such removal action, (identifying the name, docket number, and the effective date of this Settlement); and

17

2)      Notify EPA and the State of the name and address of the proposed transferee and provide EPA and the State with a copy of the above notice that it provided to the proposed transferee.

47.      Notwithstanding any provision of the Settlement, EPA and the State retain all of their access authorities and rights, as well as all of their rights to require land, water, or other resource use restrictions, including enforcement authorities related thereto under CERCLA, RCRA, and any other applicable statute or regulations.

## X. ACCESS TO INFORMATION

48.      Subject to Paragraphs 49 and 50, Respondent shall provide to EPA and the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within Respondent's possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this Settlement, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. Respondent shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

49.      <u>Privileged and Protected Claims</u>.

a.      Respondent may assert all or part of a Record requested by EPA or the State is privileged or protected as provided under federal law, in lieu of providing the Record, provided Respondents comply with Paragraph 49.b, and except as provided in Paragraph 49.c.

b.      If Respondent asserts such a privilege or protection, it shall provide EPA and the State with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, Respondents shall provide the Record to EPA and the State in redacted form to mask the privileged or protected portion only. Respondents shall retain all Records that they claim to be privileged or protected until EPA and the State have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in Respondent's favor.

c.      Respondent may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological, or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that Respondent is required to create or generate pursuant to this Settlement.

50.      <u>Business Confidential Claims</u>. Respondent may assert that all or part of a Record provided to EPA and the State under this Section or Section XI (Record Retention) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Respondent shall segregate and clearly identify

18

all Records or parts thereof submitted under this Settlement for which Respondent asserts business confidentiality claims. Records submitted to EPA determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the State, or if EPA has notified Respondent that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Respondent.

51. Notwithstanding any provision of this Settlement, EPA and the State retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XI. RECORD RETENTION

52. Until ten (10) years after EPA provides Respondent with notice, pursuant to Section XXVII (Notice of Completion of Work), that all Work has been fully performed in accordance with this Settlement, Respondent shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control, or that come into its possession or control, that relate in any manner to its liability under CERCLA with regard to the Site, provided, however, that Respondent must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. Respondent must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non- identical copies of the last draft or final version of any Records (including Records in electronic form) now in their possession or control or that come into their possession or control that relate in any manner to the performance of the Work, provided, however, that Respondent (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

53. At the conclusion of the document retention period, Respondent shall notify EPA and the State at least ninety (90) days prior to the destruction of any such Records, and, upon request by EPA or the State, and except as provided in Paragraph 49 (Privileged and Protected Claims), Respondent shall deliver any such Records to EPA or the State.

54. Respondent certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by EPA or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XII. COMPLIANCE WITH OTHER LAWS

55. Nothing in this Settlement limit Respondent's obligations to comply with the requirements of all applicable state and federal laws and regulations, except as provided in

19

Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-site actions required pursuant to this Settlement shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements (ARARs) under federal environmental or state environmental or facility siting laws.

56.     No local, state, or federal permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work), including studies, if the action is selected and carried out in compliance with Section 121 of CERCLA, 42 U.S.C. § 9621. Where any portion of the Work that is not on-site requires a federal or state permit or approval, Respondent shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals. Respondents may seek relief under the provisions of Section XVI (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals. This Settlement is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XIII. EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

57.     Emergency Response. If any event occurs during performance of the Work that causes or threatens to cause a release of Waste Material on, at, or from the Site that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Respondent shall immediately take all appropriate action to prevent, abate, or minimize such release or threat of release. Respondent shall take these actions in accordance with all applicable provisions of this Settlement, including, but not limited to, the Health and Safety Plan. Respondent shall also immediately notify the OSC or, in the event of his/her unavailability, the Regional Duty Officer at (312) 353-2318 of the incident or Site conditions. In the event that Respondent fails to take appropriate response action as required by this Paragraph, and EPA takes such action instead, Respondent shall reimburse EPA for all costs of such response action not inconsistent with the NCP pursuant to Section XIV (Payment of Response Costs).

58.     Release Reporting. Upon the occurrence of any event during performance of the Work that Respondent are required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004, Respondent shall immediately orally notify the OSC or, in the event of his/her unavailability, the Regional Duty Officer at (312) 353-2318, and the National Response Center at (800) 424-8802. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004.

59.     For any event covered under this Section, Respondent shall submit a written report to EPA within seven (7) days after the onset of such event, setting forth the action or event that occurred and the measures taken, and to be taken, to mitigate any release or threat of release

or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release or threat of release.

## XIV. PAYMENT OF RESPONSE COSTS

60.   <u>Payments for Future Response Costs</u>. Respondent shall pay to EPA all Future Response Costs not inconsistent with the NCP.

a.   <u>Periodic Bills</u>. On a periodic basis, EPA will send Respondent a bill requiring payment that includes an Itemized Cost Summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, WDNR, and the United States Department of Justice. Respondent shall make all payments within 30 days after Respondent's receipt of each bill requiring payment, except as otherwise provided in Paragraph 62 (Contesting Future Response Costs).

b.   Respondent shall make payment to EPA by Fedwire Electronic Funds Transfer (EFT) to:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York, NY 10045
> Field Tag 4200 of the Fedwire message should read "D 68010727 Environmental Protection Agency"

and shall reference Site/Spill ID Number B51Q and the EPA docket number for this action.

**For ACH payment:**

Respondent shall make payment to EPA by Automated Clearinghouse (ACH) to:

> PNC Bank
> 808 17th Street, NW
> Washington, DC 20074
> Contact - Jesse White 301-887-6548
> ABA = 051036706
> Transaction Code 22 - checking
> Environmental Protection Agency
> Account 310006
> CTX Format

and shall reference Site/Spill ID Number B51Q and the EPA docket number for this action.

c.   At the time of payment, Respondents shall send notice that payment has been made to **EPA's OSC/RPM,** and to the EPA Cincinnati Finance Office by email at cinwd_acctsreceivable@epa.gov, or by mail to:

21

EPA Cincinnati Finance Office
26 W. Martin Luther King Drive
Cincinnati, Ohio 45268

Such notice shall reference Site/Spill ID Number B51Q and the EPA docket number for this action.

      d.     <u>Deposit of Future Response Costs Payments</u>. The total amount to be paid by Respondent pursuant to Paragraph 60.a.-c. (Periodic Bills) shall be deposited by EPA in the Solvay Coke Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Solvay Site Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by Respondent pursuant to the dispute resolution provisions of this Settlement or in any other forum.

      61.     <u>Interest</u>. In the event that any payment for Future Response Costs is not made by the date required, Respondent shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of Respondent's payment unless payment is made by the date required. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondent's failure to make timely payments under this Section, including but not limited to, payment of stipulated penalties pursuant to Article XVII (Stipulated Penalties).

      62.     <u>Contesting Future Response Costs</u>. Respondent may initiate the procedures of Section XV (Dispute Resolution) regarding payment of any Future Response Costs billed under Paragraph 60 (Payments for Future Response Costs) if they determine that EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if they believe EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. To initiate such dispute, Respondent shall submit a Notice of Dispute in writing to the OSC within 30 days after receipt of the bill. Any such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If Respondent submits a Notice of Dispute, Respondent shall within the 30-day period, also as a requirement for initiating the dispute, (a) pay all uncontested Future Response Costs to EPA in the manner described in Paragraph 60, and (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC) and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Respondent shall send to the OSC a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow

22

account. If EPA prevails in the dispute, within 5 days after the resolution of the dispute, Respondent shall pay the sums due (with accrued interest) to EPA in the manner described in Paragraph 60. If Respondent prevails concerning any aspect of the contested costs, Respondent shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to EPA in the manner described in Paragraph 60. Respondent shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Respondent's obligation to reimburse EPA for its Future Response Costs.

## XV. DISPUTE RESOLUTION

63.     Unless otherwise expressly provided for in this Settlement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement. The Parties shall attempt to resolve any disagreements concerning this Settlement expeditiously and informally.

64.     Informal Dispute Resolution. If Respondent objects to any EPA action taken pursuant to this Settlement, including billings for Future Response Costs, it shall send EPA a written Notice of Dispute describing the objection(s) within fifteen (15) days after such action. EPA and Respondent shall have sixty (60) days from EPA's receipt of Respondents' Notice of Dispute to resolve the dispute through informal negotiations (the "Negotiation Period"). The Negotiation Period may be extended at the sole discretion of EPA. Any agreement reached by the Parties pursuant to this Section shall be in writing and shall, upon signature by the Parties, be incorporated into and become an enforceable part of this Settlement.

65.     Formal Dispute Resolution. If the Parties are unable to reach an agreement within the Negotiation Period, Respondent shall, within twenty (20) days after the end of the Negotiation Period, submit a statement of position to the OSC. EPA may, within twenty (20) days thereafter, submit a statement of position. Thereafter, an EPA management official at the Director level or higher will issue a written decision on the dispute to Respondent. EPA's decision shall be incorporated into and become an enforceable part of this Settlement. Respondent shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with EPA's decision, whichever occurs.

66.     Except as provided in Paragraph 62 (Contesting Future Response Costs) or as agreed by EPA, the invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of Respondent under this Settlement. Except as provided in Paragraph 62, stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Settlement. In the event that Respondent does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XVII (Stipulated Penalties).

23

## XVI. FORCE MAJEURE

67.    "Force Majeure" for purposes of this Settlement, is defined as any event arising from causes beyond the control of Respondent, of any entity controlled by Respondent, or of Respondent's contractors that delays or prevents the performance of any obligation under this Settlement despite Respondent's best efforts to fulfill the obligation. The requirement that Respondent exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or increased cost of performance.

68.    If any event occurs or has occurred that may delay the performance of any obligation under this Settlement for which Respondent intends or may intend to assert a claim of force majeure, Respondent shall notify EPA's OSC orally or, in his or her absence, the alternate EPA OSC, or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 5, within fifteen (15) of when Respondent first knew that the event might cause a delay. Within ten (10) days thereafter, Respondent shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondent's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of Respondent, such event may cause or contribute to an endangerment to public health or welfare, or the environment. Respondent shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. Respondent shall be deemed to know of any circumstance of which Respondent, any entity controlled by Respondent, or Respondent's contractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude Respondent from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph 67 and whether Respondent has exercised its best efforts under Paragraph 67, EPA may, in its unreviewable discretion, excuse in writing Respondent's failure to submit timely or complete notices under this Paragraph.

69.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Settlement that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify Respondent in writing of its decision. If EPA agrees that the delay is attributable to a force majeure, EPA will notify Respondent in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

70.    If Respondent elects to invoke the dispute resolution procedures set forth in Section XV (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's

notice. In any such proceeding, Respondent shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Respondent complied with the requirements of Paragraphs 57 and 58. If Respondent carries this burden, the delay at issue shall be deemed not to be a violation by Respondent of the affected obligation of this Settlement identified to EPA.

71.    The failure by EPA to timely complete any obligation under the Settlement is not a violation of the Settlement, provided, however, that if such failure prevents Respondent from meeting one or more deadlines under the Settlement, Respondent may seek relief under this Section.

## XVII. STIPULATED PENALTIES

72.    Respondent shall be liable to EPA for stipulated penalties in the amounts set forth in Paragraph 73 for failure to comply with the requirements of this Settlement specified below, unless excused under Section XVI (Force Majeure). "Compliance" by Respondent shall include completion of all activities and obligations, including payments, required under this Settlement, or any deliverable approved under this Settlement, in accordance with all applicable requirements of law, this Settlement, the attached SOW, and any deliverables approved under this Settlement and within the specified time schedules established by and approved under this Settlement.

73.    Stipulated Penalty Amounts

a.    The following stipulated penalties shall accrue per violation per day for any noncompliance identified in Paragraph 73.b:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $   300.00 | 1st through 14th day |
| $   600.00 | 15th through 30th day |
| $1,200.00 | 31st day and beyond |

b.    The stipulated penalties in 73.a shall accrue per day for any noncompliance with the requirements of this Settlement, including:

1)    Failure to submit timely or adequate plans, reports, technical memoranda or other written documents required by the SOW in accordance with the Schedule in the SOW;

2)    Failure to complete and submit the Removal Action Work Plan;

3)    Failure to initiate, perform, complete, or submit any requirement in Section XVIII (Work to be Performed) of this Settlement;

4)    Failure to submit monthly progress reports;

25

5)       Failure to complete and submit the Final Report;

6)       Failure to meet any scheduled deadline in the Settlement or attached SOW; and

7)       Failure to meet any other obligation or requirement, including timely payment of Future Response Costs, required by this Settlement or the SOW.

74.      In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 85 (Work Takeover), Respondents shall be liable for a stipulated penalty in the amount of $100,000.00.

75.      All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. Penalties shall continue to accrue during any dispute resolution period, and shall be paid within 15 days after the agreement or the receipt of EPA's decision or order. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under Paragraph 35 (Removal Action Work Plan), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Respondents of any deficiency; and (b) with respect to a decision by the EPA Management Official at the Director level or higher, under Paragraph 65 (Formal Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the EPA Management Official issues a final decision regarding such dispute. Nothing in this Settlement shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement.

76.      Following EPA's determination that Respondent has failed to comply with a requirement of this Settlement, EPA may give Respondent written notification of the failure and describe the noncompliance. EPA may send Respondents a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Respondent of a violation.

77.      All penalties accruing under this Section shall be due and payable to EPA within 30 days after Respondent's receipt from EPA of a demand for payment of the penalties, unless Respondent invokes the Dispute Resolution procedures under Section XV (Dispute Resolution) within the 30-day period. All payments to EPA under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with Paragraph 60 (Payments for Future Response Costs).

78.      If Respondent fails to pay stipulated penalties when due, Respondent shall pay Interest on the unpaid stipulated penalties as follows: (a) if Respondent has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to Paragraph 60 until the date of payment; and (b) if Respondent fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under Paragraph 60 until the date of payment. If Respondent fails to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

79.     The payment of penalties and Interest, if any, shall not alter in any way Respondent's obligation to complete the performance of the Work required under this Settlement.

80.     Nothing in this Settlement shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Respondent's violation of this Settlement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Sections 106(b) and 122(1) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(1), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), provided however, that EPA shall not seek civil penalties pursuant to Section 106(b) or Section 122(1) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is collected pursuant to this Settlement or in the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 85 (Work Takeover).

81.     Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement.

## XVIII. COVENANTS BY EPA

82.     Except as provided in Section XIX (Reservations of Rights by EPA), EPA covenants not to sue or to take administrative action against Respondent pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the complete and satisfactory performance by Respondent of its obligations under this Settlement. These covenants extend only to Respondent and do not extend to any other person.

## XIX. RESERVATIONS OF RIGHTS BY EPA

83.     Except as specifically provided in this Settlement, nothing in this Settlement shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants, or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing in this Settlement shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Settlement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondent in the future to perform additional activities pursuant to CERCLA or any other applicable law.

84.     The covenants set forth in Section XVIII (Covenants by EPA) do not pertain to any matters other than those expressly identified therein. EPA reserves, and this Settlement is without prejudice to, all rights against Respondent with respect to all other matters, including, but not limited to:

        a.     liability for failure by Respondent to meet a requirement of this Settlement;

27

b.     liability for costs not included within the definition of Future Response Costs;

c.     liability for performance of response action other than the Work;

d.     criminal liability;

e.     liability for violations of federal or state law that occur during or after implementation of the Work;

f.     liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g.     liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

h.     liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site not paid as Future Response Costs under this Settlement.

85.     <u>Work Takeover</u>.

a.     In the event EPA determines that Respondent: (1) has ceased implementation of any portion of the Work; (2) is seriously or repeatedly deficient or late in its performance of the Work; or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to Respondent. Any Work Takeover Notice issued by EPA (which writing may be electronic) will specify the grounds upon which such notice was issued and will provide Respondent a period of three (3) days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b.     If, after expiration of the 3-day notice period specified in Paragraph 85.a, Respondent has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify Respondent in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this Paragraph 85.b.

c.     Respondent may invoke the procedures set forth in Paragraph 65 (Formal Dispute Resolution) to dispute EPA's implementation of a Work Takeover under Paragraph 85.b. However, notwithstanding Respondent's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under Paragraph 85.b until the earlier of (1) the date that Respondent remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a written decision terminating such Work Takeover is rendered in accordance with Paragraph 65 (Formal Dispute Resolution).

28

d.     Notwithstanding any other provision of this Settlement, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XX. COVENANTS BY RESPONDENT

86.     Respondent covenants not to sue and agrees not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Future Response Costs, and this Settlement, including, but not limited to:

a.     any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b.     any claims under Sections 107 and 113 of CERCLA, Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), or state law regarding the Work, Future Response Costs, and this Settlement;

c.     any claim arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the State Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law; or

87.     Except as provided in Paragraph 86, these covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to any of the reservations set forth in Section XIX (Reservations of Rights by EPA), other than in Paragraph 84.a (liability for failure to meet a requirement of the Settlement), 84.d (criminal liability), or 84.e (violations of federal/state law during or after implementation of the Work), but only to the extent that Respondent's claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

88.     Nothing in this Settlement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

89.     Respondent reserves, and this Settlement is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of Respondent's deliverables or activities.

29

## XXI. OTHER CLAIMS

90.     By issuance of this Settlement, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondent. The United States or EPA shall not be deemed a party to any contract entered into by Respondent or their directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Settlement.

91.     Except as expressly provided in Paragraphs 86 (Covenants by Respondent) and Section XVIII (Covenants by EPA), nothing in this Settlement constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Settlement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages, and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

92.     No action or decision by EPA pursuant to this Settlement shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXII. EFFECT OF SETTLEMENT/CONTRIBUTION

93.     Except as provided in Paragraphs 86 and 87 (Covenants by Respondent), nothing in this Settlement shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Settlement. Except as provided in Section XX (Covenants by Respondent), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this Settlement diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

94.     The Parties agree that this Settlement constitutes an administrative settlement pursuant to which Respondent has, as of the Effective Date, resolved liability to the United States within the meaning of Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this Settlement. The "matters addressed" in this Settlement are the Work and Future Response Costs.

95.     The Parties further agree that this Settlement constitutes an administrative settlement pursuant to which Respondent has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

96.     Respondent shall, with respect to any suit or claim brought by it for matters related to this Settlement, notify EPA in writing no later than sixty (60) days prior to the initiation of such suit or claim. Respondent also shall, with respect to any suit or claim brought

against it for matters related to this Settlement, notify EPA in writing within ten (10) days after service of the complaint or claim upon it. In addition, Respondent shall notify EPA within ten (10) days after service or receipt of any Motion for Summary Judgment and within ten (10) days after receipt of any order from a court setting a case for trial, for matters related to this Settlement.

97. In any subsequent administrative or judicial proceeding initiated by EPA, or by the United States on behalf of EPA, for injunctive relief, recovery of response costs, or other relief relating to the Site, Respondent shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenant by EPA set forth in Section XVIII (Covenants by EPA).

## XXIII. INDEMNIFICATION

98. The United States does not assume any liability by entering into this Settlement or by virtue of any designation of Respondent as EPA's authorized representative under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), and 40 C.F.R. 300.400(d)(3). Respondent shall indemnify, save, and hold harmless the United States, its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Respondent, its officers, directors, employees, agents, contractors, or subcontractors, and any persons acting on Respondent's behalf or under their control, in carrying out activities pursuant to this Settlement. Further, Respondent agrees to pay the United States all costs it incurs, including but not limited to attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of Respondent, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under their control, in carrying out activities pursuant to this Settlement. The United States shall not be held out as a party to any contract entered into by or on behalf of Respondent in carrying out activities pursuant to this Settlement. Neither Respondent nor any such contractor shall be considered an agent of the United States.

99. The United States shall give Respondent notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Respondent prior to settling such claim.

100. Respondent covenants not to sue and agrees not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between Respondent and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, Respondent shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Respondent and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

31

## XXIV. INSURANCE

101.     No later than five (5) days before commencing any on-site Work, Respondents shall secure, and shall maintain until the first anniversary after issuance of Notice of Completion of Work pursuant to Section XXVII (Notice of Completion of Work), general liability insurance and automobile insurance with limits of $2 million, combined single limit, naming EPA as an additional insured with respect to all liability arising out of the activities performed by or on behalf of Respondent pursuant to this Settlement. In addition, for the duration of the Settlement, Respondent shall provide EPA with certificates of such insurance and a copy of each insurance policy. Respondent shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. In addition, for the duration of the Settlement, Respondent shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Respondent in furtherance of this Settlement. If Respondent demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in a lesser amount, Respondent need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. EPA acknowledges and accepts that Respondent is self-insured for general and automobile liability with excess insurance provided on a claims-first-made basis, and that if insurance is not provided by Respondent's contractors to satisfy the requirements of this paragraph, Respondent will respond with its own self-insurance program.

## XXV. MODIFICATION

102.     The OSC may modify any plan or schedule in writing or by oral direction. Any oral modification will be memorialized in writing by EPA promptly, but shall have as its effective date the date of the OSC's oral direction. Any other requirements of this Settlement may be modified in writing by mutual agreement of the Parties.

103.     If Respondent seeks permission to deviate from any approved work plan or schedule Respondent's Project Coordinator shall submit a written request to EPA for approval outlining the proposed modification and its basis. Respondent may not proceed with the requested deviation until receiving oral or written approval from the OSC pursuant to Paragraph 24.

104.     No informal advice, guidance, suggestion, or comment by the OSC or other EPA representatives regarding any deliverable submitted by Respondent shall relieve Respondent of its obligation to obtain any formal approval required by this Settlement, or to comply with all requirements of this Settlement, unless it is formally modified.

32

## XXVI. ADDITIONAL REMOVAL ACTION

105.     If EPA determines that additional removal actions not included in the Removal Work Plan or other approved plan(s) are necessary to protect public health, welfare, or the environment, and such additional removal actions are consistent with the Action Memorandum and SOW, EPA will notify Respondent of that determination. Unless otherwise stated by EPA, within 30 days after receipt of notice from EPA that additional removal actions are necessary to protect public health, welfare, or the environment, Respondent shall submit for approval by EPA a work plan for the additional removal actions. The plan shall conform to applicable requirements of Section VIII (Work to Be Performed) of this Settlement. Upon EPA's approval of the plan pursuant to Paragraph 35 (Removal Action Work Plan), Respondent shall implement the plan for additional removal actions in accordance with the provisions and schedule contained therein. This Section does not alter or diminish the OSC's authority to make oral modifications to any plan or schedule pursuant to Section XXV (Modification).

## XXVII. NOTICE OF COMPLETION OF WORK

106.     When EPA determines, after EPA's review of the Final Report, that all Work has been fully performed in accordance with this Settlement, with the exception of any continuing obligations required by this Settlement, EPA will provide written notice to Respondent. If EPA determines that such Work has not been completed in accordance with this Settlement, EPA will notify Respondent, provide a list of the deficiencies, and require that Respondent modify the Removal Work Plan if appropriate in order to correct such deficiencies. Respondent shall implement the modified and approved Removal Work Plan and shall submit a modified Final Report in accordance with the EPA notice. Failure by Respondent to implement the approved modified Removal Work Plan shall be a violation of this Settlement.

## XXVIII. INTEGRATION/APPENDICES

107.     This Settlement and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement. The parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Settlement. The following appendices are attached to and incorporated into this Settlement:

a.     Appendix A is a legal description of the Site and a Site map.

b.     Appendix B is the Statement of Work.

## XXIX. EFFECTIVE DATE

108.     This Settlement shall be effective the day the Settlement is signed by the Regional Administrator or his/her delegate.

33

IT IS SO AGREED AND ORDERED:

**U.S. ENVIRONMENTAL PROTECTION AGENCY:**

8/31/2017
Dated

Margaret M. Guerriero, Acting Director
Superfund Division, Region 5

**WISCONSIN GAS LLC (d/b/a We Energies):**

August 24, 2017
Dated

Bruce W. Ramme
Vice President Environmental
Wisconsin Gas LLC
333 W. Everett Street
Milwaukee, WI 53203

34

**APPENDIX A - - "UPLANDS" AREA DESIGNATED BY ORANGE LINE**



35

**APPENDIX B**

**STATEMENT OF WORK FOR**
**ENGINEERING EVALUATION/COST ANALYSIS AND REMOVAL ACTION**
**IMPLEMENTATION**
**AT THE UPLANDS AREA OF THE**
**MILWAUKEE SOLVAY COKE & GAS SITE**
**MILWAUKEE, WISCONSIN**

**PURPOSE:**

The purpose of this Statement of Work (SOW) is to set forth requirements for the preparation of an Engineering Evaluation/Cost Analysis (EE/CA) which shall evaluate alternatives for conducting a non-time critical removal action at Uplands areas of the Milwaukee Solvay Coke & Gas Superfund Site (Site), and for setting forth requirements for implementation of the selected removal action at the Uplands area of the Site pursuant to the Administrative Order by Consent between Respondent and the United States Environmental Protection Agency dated August 2017. Respondent shall furnish all personnel, materials, and services necessary for, or incidental to, performing the EE/CA at the Site, except as otherwise specified herein.

A detailed characterization of the Site has already been conducted as reflected in a Remedial Investigation Report approved by EPA on September 14, 2016 ("RI Report"). The RI Report was prepared pursuant to an Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study as of January 31, 2007 (V-W-07-C-861).

SCOPE:

Task 1. Communication and Meetings
Task 2. EE/CA Support Sampling Plan and Quality Project Plan (QAPP)
Task 3. Data Report
Task 4. Engineering Evaluation/Cost Analysis (EE/CA) and EE/CA Report
Task 5. Site Security, Maintenance, and Preparation
Task 6. Removal Action Work Plan
Task 7. Removal Action Implementation
Task 8. Final Report
Schedule for Deliverables

**TASK 1 – Communication and Meetings**

This task delineates the requirements for the Respondent to provide communication to the U.S. Environmental Protection Agency, Region 5 in a timely and consistent manner. This task will include, but not be limited to, the following:

- Regularly scheduled meetings and/or conference calls between the Respondent and EPA.

- Preparation of progress reports submitted to EPA in accordance with the times noted in this SOW. At a minimum, progress reports shall contain the following information regarding the preceding reporting period:

- A description of the actions which have been taken to comply with the Settlement Agreement (including the SOW) during the previous reporting period;

- Summaries of new findings;

- Summaries of all deviations from any approved Work Plan, Sampling and Analysis Plan ("SAP") and Quality Assurance Project Plan ("QAPP");

- Summaries of all difficulties or anticipated difficulties in meeting the schedule or objectives set forth in the SOW and Work Plan;

- Summaries of all solutions developed or planned (or implemented or initiated in exigent circumstances) to address any actual or anticipated problems or delays;

- Changes in key personnel;

- A description of all work planned for the next reporting period with schedules relating such work to the overall project schedule, including percentage of completion data; and

- A list of sampling and testing reports and all other final data reports received by Respondent, other than those generated pursuant to this Settlement Agreement, which relate in any way to the Site or the EE/CA.

- Notification to EPA of impending field activities at least 7 days prior to field activities. This will allow EPA to determine whether oversight of any field activities will occur.

- Distribution of deliverables. When modifying deliverables in accordance with EPA revisions or modifications, Respondent shall provide a redline version of the revised deliverables and, if requested by EPA, shall also provide a written response to each revision or modification indicating how and where the revision or modification was addressed.

## TASK 2 – EE/CA Support Sampling Plan and Quality Assurance Project Plan (QAPP)

Within twenty (20) days of the effective date of the Administrative Order, Respondent shall submit to EPA an EE/CA Support Sampling Plan, including a summary of data acquisition activities, if any, to be used in preparation for the EE/CA. The objective of this EE/CA support sampling is to further determine the nature and extent of the chemicals of concern at the Site, and address any remaining data gaps at the Site. Much of these conditions have already been studied during various investigations at the Site, including but not limited to, prior Removal Actions and the Remedial Investigation (RI). In addition, Respondent shall identify any data requirements of specific technologies that may be necessary to evaluate removal alternatives in the EE/CA. The On-Scene Coordinator/Remedial Project Manager (RPM) and the Respondent shall meet in advance of submittal of the EE/CA Support Sampling Plan to discuss additional sampling needs, if any, for the Site. EPA may approve, disapprove or request modification to the EE/CA Support Sampling Plan. If EPA disapproves or requests modification, Respondent shall submit a revised EE/CA Support

Sampling Plan that incorporates EPA's modifications within ten (10) days of receipt of EPA's request.

The EE/CA Support Sampling Plan shall contain a description of equipment specifications, required analyses, sample types, sample locations, and frequency of data acquisition activities. Respondent shall provide a schedule stating when events will take place and when deliverables will be submitted.

Additional items may be added to the EE/CA Support Sampling Plan as additional information becomes available during the development of the EE/CA. All additional data acquisition activities shall be approved in advance by the RPM and meet all other requirements specified in this SOW and the resulting Work Plan, including the need to update the Work Plan.

The EE/CA Support Sampling Plan shall include the following information:

I.      Site Background

A brief summary of the Site, general physiography, hydrology, and geology shall be included. A description of the data already available shall be included and shall highlight the areas of known Contaminants of Concern (COCs) and the levels detected. Tables shall be included to display the minimum and maximum levels of detected COCs across the Site.

II.     Data Gap Description

Respondent shall make an analysis of the currently available data to determine any areas in and around the Site that require further analysis to define the nature and extent of impact for purposes of implementing a removal action. A description of the number, types, and locations of additional samples to be collected shall be included in this section of the sampling plan.

Descriptions of the following activities shall also be included:

      A.      Waste Characterization

      Respondents shall include a program for characterizing the waste materials at the Site. This shall include an analysis of current information/data on past disposal practices at the Site.

      B.      Impacted Groundwater

      Respondent shall analyze the current data/information to determine if additional groundwater sampling is needed to complete the EE/CA. If it is deemed necessary by the RPM, the Respondent shall include a program for further characterizing the impacted groundwater at Site, assess the potential for migration of impacted groundwater, and/or assess the potential for vapor intrusion into current and future structures.

      C.      Subsurface Geologic Investigation

      Respondent shall include an analysis of existing subsurface geologic data and determine the data needed to adequately assess all removal alternatives to be included in the EE/CA.

38

D.    Soils Investigation

Respondent shall analyze the current data/information to determine if additional soil sampling is needed to complete the EE/CA. If deemed necessary by the RPM, the Respondent shall include a program to further characterize the nature and extent of contamination of surface and subsurface soils at the Site, assess the potential for migration of contaminants from impacted surface and subsurface soils to groundwater and surface water (which may include a survey of Site shoreline stability), and/or assess the potential for vapor intrusion into current and future structures.

III.    Quality Assurance Project Plan (QAPP)

Respondent shall submit a QAPP in accordance with the requirements of this AOC. Respondent shall include a description of the depths of sampling, parameters to be analyzed, equipment to be used, decontamination procedures to be followed, sample quality assurance, data quality objectives, and sample management procedures to be utilized in the field.

If Respondent has a Quality Assurance Project Plan (QAPP) already approved by EPA that meets the requirements of this AOC and is applicable to the work conducted to develop the EE/CA, Respondent can submit it, along with any necessary addenda, for review and approval.

IV.    Health and Safety Plan

Respondent shall prepare a Site Health and Safety Plan which is designed to protect on-site personnel, area residents and nearby workers from physical, chemical, and all other hazards posed by this sampling event.

If Respondent has a Health and Safety Plan (HSP) already approved by EPA that meets the requirements of this AOC and is applicable to the work conducted to develop the EE/CA, Respondent can submit it, along with any necessary addenda, for review and approval.

V.    Schedule

Respondent shall include a schedule which identifies timing for initiation and completion of all tasks to be completed as part of this EE/CA Support Sampling Plan.

Respondent shall conduct any EE/CA support sampling activity according to the approved EE/CA Support Sampling Plan and schedule. Respondent shall coordinate activities with the RPM from EPA who is assigned to this Site. Respondent shall provide the RPM with all laboratory data collected under the AOC.

**TASK 3 – Data Report**

According to the EPA-approved schedule in the EE/CA Support Sampling Plan, a report, in table-form, shall be provided by the Respondent to EPA. This report shall summarize the sampling results from both the EE/CA Support Sampling and from any previous sampling events used or to be used to conduct the EE/CA. If requested, copies of all raw data shall be provided by Respondent to EPA for a validation check.

39

**TASK 4 – Engineering Evaluation/Cost Analysis (EE/CA) and EE/CA Report**

The EE/CA shall be conducted, at a minimum, consistent with EPA guidance entitled, "Guidance on Conducting Non-Time Critical Removal Actions Under CERCLA," EPA/540-R-93-057, Publication 9360.32, PB 93963402, dated August 1993.

The preliminary list of alternatives to address the Site shall consist of, but not be limited to, one or more alternatives from each of the following generic removal alternative categories:

- capping
- excavation/extraction
- treatment
- no action

**TASK 5 – Site Security, Maintenance, and Preparation**

Respondent shall implement any measures necessary to secure, maintain and prepare the Site for implementation of the Removal Action. These measures may include the following: installation and maintenance of a perimeter fence for site security; clearing of vegetation; trash removal from within the property boundary; demolishing of remaining structures; removal of coal, coke, and asphalt piles; crushing and stockpiling of clean brick and concrete; confirming the status of Pipe 4 and filling or retiring Pipe 4 in place as necessary; and addressing the presence of asbestos-containing material in accordance with applicable state and local ordinances and permits.

Respondent shall perform this task in a timely manner, whether before or after the effective date of this Settlement, consistent with good commercial practice and applicable laws and regulations.

**TASK 6 – Removal Action Work Plan**

Within thirty (30) days of receiving written notice to proceed from EPA, Respondent shall submit for EPA's approval, a Removal Action Work Plan for implementation of the removal action selected by EPA. The Removal Action Work Plan shall be prepared in accordance with the requirements of the AOC.

**TASK 7 – Removal Action Implementation**

Within thirty (30) days after receipt of approval of the Removal Action Work Plan, Respondent shall commence implementation of the Work in accordance with the schedule included therein. The Removal Action shall be implemented in accordance with the requirements of the AOC.

**TASK 8 – Final Report**

Within sixty (60) days after completion of all Work required by this Settlement, other than continuing obligations under the AOC, Respondent shall submit for EPA review a final report summarizing the actions taken to comply with this Settlement. The Final Report shall be prepared in accordance with the requirements of the AOC.

## Schedule for Deliverables

Monthly Progress Reports

Five (5) business days after the effective date of the AOC, and thereafter on the fifteenth (15th) calendar day of the month, except that if that day falls on a Saturday, Sunday, or federal or State holiday, the next working day.

EE/CA Support Sampling Plan

Twenty (20) business days after the effective date of the AOC

Revised EE/CA Support Sampling Plan (if required by U.S. EPA)

Ten (10) business days after receipt of EPA comments on the original submittal

Data Report

Pursuant to Schedule in approved EE/CA Support Sampling Plan

Draft EE/CA Report

Forty (40) business days after EPA acceptance of the Data Report

Revised EE/CA Report (if required by U.S. EPA)

Fifteen (15) business days after receipt of EPA comments on the original submittal

Draft Removal Action Work Plan

Thirty (30) business days after receipt of EPA notice to proceed

Revised Removal Action Work Plan

Thirty (30) business days after receipt of EPA comments on the original submittal

Final Report

Sixty (60) business days after completion of all Work required by the Administrative Order on Consent, excepting continuing obligations under the AOC